UNITED STATE DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Tony Roberts**, | Case No. 15cv1044 WQH (RBM) |
| Plaintiff, | **REPORT AND RECOMMENDATION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 172)** |
| v. | |
| **J. Beard et al.**, | |
| Defendants. | |

I.    INTRODUCTION

Plaintiff Tony Roberts, an inmate currently incarcerated at California Health Care Facility, has filed a 42 U.S.C. § 1983 lawsuit against staff at the RJ Donovan Correctional Facility for violations of his First Amendment right to file grievances and for various violations of state law. (Doc. 1, at 3-4.) Plaintiff alleges that Defendants R. Davis, A. Buenrostro, C. Meza, A. Parker, R. Solis, R. Santiago, and K. Seibel – all prison staff – retaliated against him for engaging in First

1

Amendment conduct.[1] (Doc. 1, at 11-12.) Defendants have filed a motion for summary judgment on the following grounds: 1) The undisputed evidence shows that Defendants did not retaliate against Plaintiff in violation of his First Amendment rights; 2) Plaintiff's state law claims do not create enforceable individual rights; and 3) Defendants are entitled to qualified immunity.[2] (Doc. 172-1, at 19-24.) For the following reasons, the Court recommends granting in part and denying in part Defendants' motion for summary judgment.

II.    ALLEGATIONS

Plaintiff alleges that "Defendants conspired to retaliate against [him] for engaging in 'protected conduct' when [he] petitioned for redress of his grievances" between April and October 2014. (Doc. 1, at 19.) Plaintiff alleges that Defendants Davis and Buenrostro "engaged in a series of unlawful and repressive conduct against Plaintiff and other mentally ill inmates" when Plaintiff "attempted to access [RJ Donovan's] inmate appeal procedure to complain about these Defendants' conduct" which "were either screened out or were never responded to by [RJ Donovan's] prison officials." (Doc. 1, at 10.) Plaintiff states that after he wrote the

---

[1] Plaintiff also named the following people in his Complaint: Captain S. Sanchez, L. Ciborowski, D. Arguilez, D. Paramo, and J. Beard. However, Plaintiff never properly served these Defendants. See Judge William Q. Hayes's Order, Doc. 31.

[2] Defendants also argue that the Eighth Amendment claim against Defendant Buenrostro should also be dismissed on summary judgment. (Doc. 172-1, at 6.) However, Judge Hayes already dismissed this Eighth Amendment claim against Defendant Buenrostro on summary judgment on September 24, 2018. (Doc. 136, at 6-8.)

2

"class monitors" of the California Department of Corrections and Rehabilitation's mental health delivery system, appointed under Coleman v. Brown et al., 28 F. Supp. 3d 1068 (E.D. Cal. April 11, 2014), Plaintiff was retaliated against and terrorized by Defendants A. Buenrostro, R. Davis, C. Meza, A. Parker, R. Solis, R. Santiago, and K. Seibel for engaging in First Amendment conduct. (Doc. 1, at 10-11.)

Plaintiff claims that Defendants C. Meza and A. Buenrostro prohibited Plaintiff's ability to send written communications of public interest to government officials. (Doc. 1, at 19.) Plaintiff states that Defendant C. Meza "illegal[ly] obtained a copy of a written complaint Plaintiff had drafted and submitted" to the Department of Justice and gave the complaint to Defendant Buenrostro, who then concocted false allegations against Plaintiff in retaliation and arranged with other officers Plaintiff's transfer to another prison that caused Plaintiff "to experience an exacerbation in his mental illness." (Doc. 1, at 12.) Plaintiff claims that Defendants A. Parker and A. Buenrostro conducted a cell search on June 3, 2014 and confiscated legal documents from Plaintiff including a civil rights complaint that was about to be filed against Defendants Buenrostro and Meza for the April 2, 2014 incident, in which Plaintiff was found guilty of "Openly Displaying Disrespect" to Defendant Buenrostro. (Doc. 1, at 20.) Plaintiff alleges that Defendants Buenrostro and Parker "concocted false disciplinary charges" against him, accusing him of

3

working with another prisoner to falsely accuse Defendant Buenrostro. (Doc. 1, at 20-21.)

Plaintiff claims that Defendants Davis, Meza, and Buenrostro falsely labeled Plaintiff a "snitch," causing him to be attacked by other inmates, in retaliation for exercising his First Amendment rights. (Doc. 1, at 21-24.) Plaintiff alleges that Defendant Buenrostro told other prisoners that he was a child molester on September 29, 2014, in a "calculated effort to place Plaintiff's safety in danger from other inmates." (Doc. 1, at 23.) Plaintiff claims that Defendant K. Seibel, the deputy chief warden, conspired to retaliate against Plaintiff for filing grievances by authorizing the illegal activities of the other correctional officers under her and by placing him on a list for transfer to another CDCR facility in Stockton in September and October 2014. (Doc. 1, at 14-15, 23.)

Finally, Plaintiff alleges that Defendant Buenrostro conducted a clothed body search of Plaintiff on April 2, 2014 and intentionally rubbed Plaintiff's private parts for sexual gratification in retaliation for exercising his First Amendment rights. (Doc. 1, at 11-12.) Plaintiff alleges that Buenrostro then wrote up a false and retaliatory rules violation report against him for exercising his constitutional rights. (Doc. 1, at 11.) Plaintiff alleges that Defendant Buenrostro later spoke to him in October 2014 and promised to "get some payback on your ass" and attempted to set Plaintiff up to be injured by other inmates. (Doc. 1, at 24.)

///

4

III.   EVIDENCE PRESENTED

**A. Defendants' Proffer**

Defendants A. Buenrostro and C. Meza both declared that they did not take any adverse action against Plaintiff because Plaintiff corresponded with the "class monitors" of CDCR's mental health delivery system, appointed under Coleman v. Brown et al., or for any other reason. (Buenrostro Decl. ¶ 2; Meza Decl. ¶ 3.) Defendants Buenrostro and Meza stated that they never refused to process Plaintiff's outgoing mail and that they never interfered with Plaintiff's outgoing or incoming mail. (Buenrostro Decl. ¶ 3; Meza Decl. ¶ 2.) Defendant Meza never confiscated or otherwise obtained any of Plaintiff's legal materials. (Meza Decl. ¶ 4.) Defendants Buenrostro and Parker did not confiscate a civil rights lawsuit during a search of Plaintiff's cell on June 3, 2014. (Buenrostro Decl. ¶ 11; Parker Decl. ¶ 2.)

Defendant Buenrostro was monitoring the inmates in Housing Unit A-1 on April 2, 2014. (Buenrostro Decl. ¶ 3.) Defendant Buenrostro ordered Plaintiff to leave the housing unit and go to the dining hall for breakfast or return to his cell, but he stated that Plaintiff ignored his orders. (Buenrostro Decl. ¶ 3.) Defendant Buenrostro approached Plaintiff and again ordered Plaintiff to leave the housing unit or return to his cell and Plaintiff responded, "Don't worry about what I'm doing, stupid Mexican." (Buenrostro Decl. ¶ 3.) Defendant Buenrostro stated that he searched Plaintiff because Plaintiff's actions were suspicious and unusual.

5

(Buenrostro Decl. ¶ 4.) Defendant Buenrostro told Plaintiff that he was expected to follow orders and procedures within the housing unit. (Buenrostro Decl. ¶ 4.) Plaintiff was agitated and angry and responded, "Fuck you stupid Mexican. I'm going to do what I want to do." (Buenrostro Decl. ¶ 4.) At that point, Defendant Buenrostro placed Plaintiff in handcuffs because of Plaintiff's unusual behavior and agitated state, and as a safety precaution, Plaintiff was escorted to the Program Support Unit. (Buenrostro Decl. ¶ 4.) Defendant Buenrostro declared that he did not use excessive or improper force on Plaintiff at any time during the incident and clothed body search on April 2, 2014. (Buenrostro Decl. ¶ 5.) Defendant Buenrostro stated that he did not sexually assault Plaintiff during that search and did not rub Plaintiff's private parts for sexual gratification. (Buenrostro Decl. ¶ 5.) Defendant Buenrostro searched Plaintiff because his actions were suspicious, and Defendant Buenrostro knew that Plaintiff was not assigned to cell 210. (Buenrostro Decl. ¶ 5.) Defendant Buenrostro also knew, based on his training, education, and personal experience within CDCR, that inmates often try to go to other cells for improper purposes such as delivering or obtaining contraband including drugs, weapons, currency, or electronic equipment or other property that is not theirs. (Buenrostro Decl. ¶ 5.) This, and Plaintiff's agitated state, were the only reasons why Defendant Buenrostro performed a clothed body search of Plaintiff. (Buenrostro Decl. ¶ 5.) Defendant Buenrostro wrote a 115 Rules Violation Report charging Plaintiff with behavior that leads to violence in violation of California Code of Regulations, Title

6

15, section 3005(d). (Buenrostro Decl. ¶ 6 and Exhibit A.) Defendant Buenrostro stated that he did not write this report in retaliation. (Buenrostro Decl. ¶ 6 and Exhibit A.) This Rules Violation Report was heard by a senior hearing officer, Correctional Lieutenant R. Davis, on May 1, 2014. (Buenrostro Decl. ¶ 6 and Exhibit A thereto.) Lt. Davis found Plaintiff not guilty of behavior that leads to violence, but instead found him guilty of the lesser included offense of openly displaying disrespect in violation of California Code of Regulations, Title 15, section 3004 (b). Lt. Davis's finding was based upon a preponderance of the evidence submitted at the hearing. (Buenrostro Decl. ¶ 6 and Exhibit A.) This evidence included Defendant Buenrostro's written report which stated in part that Plaintiff said "don't worry about what I'm doing stupid Mexican," and the testimony of Correctional Counselor Hailey, who told Lt. Davis that he heard Plaintiff call Defendant Buenrostro "a Mexican." (Buenrostro Decl. ¶ 6 and Exhibit A.) Plaintiff was assessed thirty days forfeiture of good-time credits, thirty days loss of evening yard privileges, and thirty days loss of dayroom privileges. (Buenrostro Decl. ¶ 6 and Exhibit A.) This 115 Rules Violation Report's guilty finding has not been overturned by the CDCR. (Buenrostro Decl. ¶ 6 and Exhibit A.) Defendant Davis, who made the guilty finding, has declared that he never participated in an "ongoing conspiracy to purposefully punish [Plaintiff] for exercising his right to file inmate grievances." (Davis Decl. ¶ 2.)

7

Defendant Buenrostro never contacted Sergeant Sanchez to plot Plaintiff's transfer to another prison, knowing that doing so would exacerbate Plaintiff's mental illness. (Buenrostro Decl. ¶ 8.) Defendant Buenrostro did not have authority to have an inmate transferred, and he had no influence over the decision to transfer an inmate. (Buenrostro Decl. ¶ 8.) Defendant Buenrostro has never sat on any of Plaintiff's classification committees, and he has never acted as a Classification Staff Representative reviewing any action concerning Plaintiff. (Buenrostro Decl. ¶ 10.)

Defendants Buenrostro and Parker did not "concoct" false disciplinary charges against Plaintiff. (Buenrostro Decl. ¶ 12; Parker Decl. ¶ 6.) Defendants Buenrostro and Parker were working as the Floor Officers in Housing Unit A-1 at RJ Donovan on June 3, 2014. (Buenrostro Decl. ¶ 13; Parker Decl. ¶ 2.) Defendants Buenrostro and Parker randomly chose to search Plaintiff's cell that day. (Buenrostro ¶¶ 13, 15; Parker Decl. ¶ 2, 4.) Defendant Parker discovered a small, clear plastic bag lying on the lower-bunk mattress underneath a blue, state-issued jacket. (Buenrostro Decl. ¶ 13; Parker Decl. ¶ 2.) The bag was filled with tobacco. (Buenrostro Decl. ¶ 13; Parker Decl. ¶ 2.) The lower bunk was assigned to Plaintiff at that time. (Buenrostro Decl. ¶ 13; Parker Decl. ¶ 2.) Defendant Parker took possession of the tobacco and disposed of it per institutional procedures. (Buenrostro Decl. ¶ 13; Parker Decl. ¶ 2.) Defendant Parker did not "plant" the bag of tobacco on Plaintiff's bunk. (Parker Decl. ¶ 4.) Defendant Parker wrote a 115 Rules Violation Report charging Plaintiff with possession of contraband (tobacco) in violation of California

8

Code of Regulations, Title 15, section 3006. (Buenrostro Decl. ¶ 14; Parker Decl. ¶ 3 and Exhibit A.) This Rules Violation Report was heard by a senior hearing officer, Correctional Lieutenant R. Davis, on July 2, 2014. (Buenrostro Decl. ¶ 14; Parker Decl. ¶ 3 and Exhibit A.) Lt. Davis ultimately found Plaintiff not guilty of this charge and dismissed the rules violation report because of insufficient evidence. (Buenrostro Decl. ¶ 14; Parker Decl. ¶ 3 and Exhibit A.) Defendants Buenrostro and Parker did not search Plaintiff's cell in retaliation for any protected conduct that Plaintiff may have engaged in or for any other improper reason. (Buenrostro Decl. ¶ 15; Parker Decl. ¶ 4.) Defendants Buenrostro and Parker searched Plaintiff's cell because they were required to perform three to five random cell searches during their shifts as floor officers. (Buenrostro Decl. ¶ 15; Parker Decl. ¶ 4.) Defendant Parker did not conspire with Buenrostro, or any other correctional staff member or inmate, to file false disciplinary charges against Plaintiff, and no one ever asked or suggested that Parker do so. (Parker Decl. ¶ 6.)

Defendants Buenrostro, Meza, and Santiago neither manufactured any charges against Plaintiff at any time, nor have they asked or pressured others to do so. (Buenrostro Decl. ¶ 20; Meza Decl. ¶ 6; Santiago Decl. ¶ 2.) Defendant Buenrostro has never taken any adverse action against Plaintiff that was not based upon a legitimate, penological reason. (Buenrostro Decl. ¶ 20.) Defendant Buenrostro never told Plaintiff that he would "get some payback" and never attempted to set up Plaintiff to be injured by other inmates. (Buenrostro Decl. ¶ 22.) Defendant

9

Buenrostro is not aware of any report or instance where Plaintiff was attacked by other inmates from April through October 2014, and he is not aware of any reports evidencing such an attack. (Buenrostro Decl. ¶ 22.) Defendant Buenrostro has never threatened Plaintiff or bribed or caused another inmate to assault, attack, or hurt Plaintiff. (Buenrostro Decl. ¶ 22-24.)

Defendant Seibel reviewed Plaintiff's transfer data on CDCR's Strategic Offender Management System (SOMS). (Seibel Decl. ¶ 5.) SOMS contains data on each CDCR inmate's case factors. (Seibel Decl. ¶ 5.) The information in SOMS shows that Plaintiff was not placed on a transfer list in September and October 2014 to be sent out of RJ Donovan. (Seibel Decl. ¶ 6.) Defendant Seibel does not have unilateral authority to place an inmate on a transfer list. (Seibel Decl. ¶ 6.) Plaintiff's records showed that RJ Donovan reviewed his case on February 18, 2014. (Seibel Decl. ¶ 8.) Plaintiff's case was referred to the Classification Staff Representative (CSR) with a recommendation that Plaintiff be retained at RJ Donovan. (Seibel Decl. ¶ 8 and Exhibit A.) The CSR endorsed the Unit Classification Committee's (UCC's) recommendation on March 26, 2014, and Plaintiff remained at RJ Donovan. (Seibel Decl. ¶ 8 and Exhibit B thereto.) This ruling was upheld at Plaintiff's next UCC hearing on September 12, 2014. (Seibel Decl. ¶ 9 and Exhibit C.) Defendant Seibel never had any knowledge that others were planning to retaliate, or were retaliating, against Plaintiff at any time. (Seibel Decl. ¶ 10.) Defendants Seibel and R. Solis never took any adverse action against

10

Plaintiff for any protected conducted that he may have engaged in, including placing Plaintiff's name on a list for transfer out of RJ Donovan. (Seibel Decl. ¶ 3; Solis Decl. ¶ 3.)

Defendants Seibel, Santiago, Solis, Meza, Davis, Buenrostro, and Parker never called Plaintiff a snitch or child molester at any time. (Seibel Decl. ¶ 11; Santiago Decl. ¶ 5; Solis Decl. ¶ 5; Meza Decl. ¶ 5; Davis Decl. ¶ 3; Buenrostro Decl. ¶ 21; and Parker Decl. ¶ 7.) In addition to creating a threat of harm to the inmate and a security risk to the institution, any of the Defendants would have faced severe disciplinary action from their supervisors and the prison administration had they called any inmate a "snitch" or a "child molester." (Buenrostro Decl. ¶ 21.)

**B. Plaintiff's Proffer**

On April 2, 2014, Plaintiff placed a CDCR Inmate Appeal 602 dated April 2, 2014 in Housing Unit #1 Appeals box, alleging sexual assault by Correctional Officer A. Buenrostro. (Roberts Decl. ¶ 3, Doc. 119, at 26.) Plaintiff declared that he never received a response from any prison official regarding the appeal. (Id.)

On June 23, 2014, Plaintiff filed a 602 Appeal dated June 19, 2014 concerning senior CDCR administrators' intentional failure to control Officers D. Arguilez, A. Buenrostro, and R. Davis. (Roberts Decl. ¶ 4, Doc. 119, at 27.) Plaintiff declared that he never received a response addressing the appeal. (Id.)

On July 8, 2014, Plaintiff gave Officer L. Ciborowski an appeal dated June 28, 2014, alleging an ongoing conspiracy to retaliate against him. (Roberts Decl. ¶ 5,

11

Doc. 119, at 27.) Plaintiff also submitted a CDCR Form 22 Inmate Request for Interview to Officer Ciborowski, who accepted it and signed it. (Id.) However, Plaintiff never received a response to the appeal. (Id.) Plaintiff stated that the administrative appeal submitted to Ciborowski on July 8, 2014 included sufficient detail to provide enough information to allow prison officials to take appropriate responsive measures. (Doc. 119, at 15.) Plaintiff declared that it has been his personal experience that RJ Donovan fails to operate an inmate appeal system that conforms to state law and places unreasonable restrictions on an inmate's ability to submit 602 appeals. (Roberts Decl. ¶ 16; Doc. 119, at 31.) Plaintiff stated that he believes that his appeals either vanished or were unlawfully rejected. (Roberts Decl. ¶ 17, 23; Doc. 119, at 31-33.)

Plaintiff declared that Officer A. Buenrostro, C. Meza, and R. Davis engaged in unlawful and repressive conduct against him as he attempted to access RJ Donovan's inmate appeal procedure to complain about the Defendants' conduct towards him. (Roberts Decl. ¶ 22, Doc. 119, at 33.) Plaintiff stated that Defendant A. Buenrostro and C. Meza illegally read and refused to process as outgoing mail a Coleman letter to class monitors on March 6, 2014. (Roberts Decl. ¶ 27, Doc. 119, at 34.) Plaintiff then concluded that as a result of his filing 602 appeals and other complaints, he was retaliated against by Defendant Buenrostro, including rubbing or touching his "male organ for the purpose of sexual gratification" during a "pat-down search." (Roberts Decl. ¶ 31, Doc. 119, at 35.) Plaintiff stated that Defendant

12

Buenrostro issued him a false 115 Rules Violation Report for behavior that leads to violence arising out of the April 2, 2014 incident. (Roberts Decl. ¶ 34, Doc. 119, at 36.) Plaintiff declared that Defendant Buenrostro falsely accused him of having contraband during the search of his cell on June 3, 2014, an accusation for which he was found not guilty. (Roberts Decl. ¶ 45, Doc. 119, at 38.) Plaintiff declared that Defendants Buenrostro and Parker confiscated a motion for preliminary injunction with attached declarations during the cell search, which denied him the ability to support his allegations for a preliminary injunction. (Roberts Decl. ¶¶ 42, 44, Doc. 119, at 37-38.) Plaintiff declared that he was attacked by several black inmates on July 14, 2014 as a result of Defendant Davis labelling him a "snitch" to another inmate and paying "Black Street Gang members money to attack" him. (Roberts Decl. ¶ 53, Doc. 119, at 40.)

Plaintiff also submitted his own declaration stating the following evidence: that Defendant Solis told another inmate that he heard that Roberts was going to be transferred and that, as a result, he was fearful that Defendant Solis was "going to cause me harm again because of filing 602's or legal actions against RJDCF prison officials" (Roberts Decl. ¶¶ 54-55, Doc. 119, at 40); that Defendant Ciborowski told him that he was going to be transferred and that Chief Deputy Warden Seibel "is tired of you with all these 602's" (Roberts Decl. ¶ 50, Doc. 119, at 39); and that inmate Billy Titus told him that he overheard Defendant Santiago telling Captain Sanchez that Roberts "had inmate Goldmas, CDCR # F-31549, injure himself in

13

order to set Officer Buenrostro up" (Roberts Decl. ¶ 49, Doc. 119, at 39).

In addition to his own declaration, Plaintiff submitted the following inmate declarations: Inmate Juley Gordon stated that Defendant Buenrostro told him that anyone found helping Plaintiff file 602 appeals would be on his hit-list. (Gordon Decl. ¶ 7, Doc. 119, at 83.) Inmate Gerald Marshall declared that Defendant Buenrostro called Plaintiff Roberts a "snitch," told him the Crips "got off on his ass a couple of months ago on the yard," and told him not to help Plaintiff with his legal papers. (Marshall Decl. ¶ 1, Doc. 119, at 98.) Inmate Curtis Rusher declared that Defendant Buenrostro told him that Plaintiff was arrested for child molestation in the 1980s, offered to provide the documents showing that what he was saying was true, and expressed his desire to see Plaintiff "handled good enough to get him out of here!" (Rusher Decl. ¶ 2, Doc. 119, at 100.) Inmate Keith Williams declared that Defendant Buenrostro told him if he and his "homeboys" put Plaintiff "in the hospital this time," he would bring "anything you want in here." (Williams Decl. ¶ 1, Doc. 119, at 103.) Inmate Kelvin Singleton declared that in July 2014, inmates who were West Coast Crip members said a correctional officer offered "five hundred dollars" to "fuck up an EOP inmate named Roberts … for snitching on him and some other officers who had come on A yard from the hole." (Singleton Decl. ¶ 3-4, Doc. 119, at 110-111.) He stated that he heard from other inmates that Roberts was attacked during night yard. (Singleton Decl. ¶ 5, Doc. 119, at 111.) Inmate Lavale Jones declared that Defendant Solis told him that he would get "transferred

14

too" if he did not tell him which officers "Roberts is doing 602's or legal paperwork against." (Jones Decl. ¶ 3, Doc. 119, at 77.) Inmate Mark Barbee declared that Defendant Davis told him that Roberts is a snitch because he "wrote a letter to the Warden and got a lot of investigations going against me and other officers." (Barbee Decl. ¶ 3, Doc. 119, at 89.) Inmate Russell Squires declared that Defendant Meza told him that Roberts was a snitch for writing 602's against fellow correctional officers. (Squires Decl. ¶ 2, Doc. 119, at 95.) He also declared that Defendant Meza said that he refused to give him "disinfect, cell phones, lighters, tobacco . . . until one of you guys put Bull in the hospital." (Id.)

IV.   STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure authorizes the granting of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The standard for granting a motion for summary judgment is essentially the same as for the granting of a directed verdict. Judgment must be entered, "if, under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "If reasonable minds could differ," however, judgment should not be entered in favor of the moving party. Id. at 250-51.

15

The parties bear the same substantive burden of proof as would apply at a trial on the merits, including plaintiff's burden to establish any element essential to his case. Liberty Lobby, 477 U.S. at 252. The moving party bears the initial burden of identifying the elements of the claim in the pleadings, or other evidence, which the moving party "believes demonstrate the absence of a genuine issue of material fact." Celotex v. Catrett, 477 U.S. 317, 323 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." S.E.C. v. Seaboard Corp., 677 F.2d 1301, 1306 (9th Cir. 1982). More than a "metaphysical doubt" is required to establish a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The burden then shifts to the non-moving party to establish, beyond the pleadings, that there is a genuine issue for trial. See Celotex, 477 U.S. at 324. To successfully rebut a properly supported motion for summary judgment, the nonmoving party "must point to some facts in the record that demonstrate a genuine issue of material fact and, with all reasonable inferences made in the plaintiff['s] favor, could convince a reasonable jury to find for the plaintiff[]." Reese v. Jefferson School Dist. No. 14J, 208 F.3d 736, 738 (9th Cir. 2000).

While the district court is "not required to comb the record to find some reason to deny a motion for summary judgment," Forsberg v. Pacific N.W. Bell Tel. Co., 840 F.2d 1409, 1418 (9th Cir. 1988), the court may nevertheless exercise its

16

discretion "in appropriate circumstances," to consider materials in the record which are on file but not "specifically referred to." Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). However, the court need not "examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could be conveniently found." Id.

In ruling on a motion for summary judgment, the court need not accept legal conclusions "in the form of factual allegations." Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981). "No valid interest is served by withholding summary judgment on a complaint that wraps nonactionable conduct in a jacket woven of legal conclusions and hyperbole." Vigliotto v. Terry, 873 F.2d 1201, 1203 (9th Cir. 1989). Moreover, "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997). While "the district court may not disregard a piece of evidence at the summary stage solely based on its self-serving nature," Nigro v. Sears, Roebuck & Co., 784 F.3d 495, 497-498 (9th Cir. 2015) (finding plaintiff's "uncorroborated and self-serving declaration sufficient to establish a genuine issue of material fact because the "testimony was based on personal knowledge, legally relevant, and internally consistent"), "[t]he district court can disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence." Id. at

17

497 (citations omitted). "[T]he court must consider whether the evidence presented in the affidavits is of sufficient caliber and quantity to support a jury verdict for the nonmovant. A 'scintilla of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to present a genuine issue as to a material fact." United Steelworkers of America v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989) (citations omitted).

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002). "We have repeatedly held that unauthorized documents cannot be considered in a motion for summary judgment." Id. "To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rule of Civil Procedure 56." Block v. City of Los Angeles, 253 F.3d 410, 418-419 (9th Cir. 2001).

V.   DISCUSSION

Defendants argue that Plaintiff has failed to establish a triable issue of material fact that Defendants R. Davis, A. Buenrostro, C. Meza, A. Parker, R. Solis, R. Santiago, and K. Seibel all retaliated against him for engaging in First Amendment conduct. (Doc. 172.) Defendants argue that the evidence shows that Defendants acted solely on the basis of legitimate penological interests and not in retaliation

18

against Plaintiff. (Doc. 172, at 20.) Defendants also argue that Plaintiff's state law claims do not contain a private right of action or other civil-enforcement mechanism. (Doc. 172-1, at 23.) Finally, Defendants argue that they are entitled to qualified immunity because their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. (Id.)

In opposition to Defendants' motion for summary judgment, Plaintiff has submitted declarations from himself and from other inmates that only address the direct actions of Defendants Buenrostro, Meza, Davis, Parker, and Solis. (Doc. 119.) Based on the evidence submitted by the parties, the Court makes the following recommendations:

**A. Defendants are entitled to summary judgment as to Plaintiff's First Amendment retaliation claims against R. Solis, R. Santiago, and K. Seibel.**

The fundamentals of a retaliation claim are easily summarized: "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408

19

F.3d 559, 567-68 (9th Cir. 2005) (citing Resnick v. Hayes, 213 F.3d 443, 449 (9th Cir. 2000)). It is the plaintiff's burden to prove each of these elements. Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995).

Under the first element, plaintiff need not prove that the alleged retaliatory action, in itself, violated a constitutional right. Id. (to prevail on a retaliation claim, plaintiff need not "establish an independent constitutional interest" was violated); see also Hines v. Gomez, 108 F.3d 265, 268 (9th Cir. 1997) (upholding jury determination of retaliation based on filing of a false rules violation report); Rizzo v. Dawson, 778 F.2d 527, 531 (9th Cir. 1985) (transfer of prisoner to a different prison constituted adverse action for purposes of retaliation claim). The interest cognizable in a retaliation claim is the right to be free of conditions that would not have been imposed but for the alleged retaliatory motive.

To prove the second element – retaliatory motive – plaintiff must show that his protected activities were a "substantial" or "motivating" factor behind the defendant's challenged conduct. Brodheim v. Cry, 584 F.3d 1262, 1269, 1271 (9th Cir. 2009). Plaintiff must provide direct or circumstantial evidence of defendant's alleged retaliatory motive; mere speculation is not sufficient. See McCollum v. CDCR, 647 F.3d 870, 882–83 (9th Cir. 2011); accord Wood v. Yordy, 753 F.3d 899, 905 (9th Cir. 2014). In addition to demonstrating defendant's knowledge of plaintiff's protected conduct, circumstantial evidence of motive may include: (1) proximity in time between the protected conduct and the alleged retaliation; (2)

defendant's expressed opposition to the protected conduct; and (3) other evidence showing that defendant's reasons for the challenged action were false or pretextual. McCollum, 647 F.3d at 882.

The third element concerns a prisoner's First Amendment right to access the courts. Lewis v. Casey, 518 U.S. 343, 346 (1996). While prisoners have no freestanding right to a prison grievance process, see Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003), "a prisoner's fundamental right of access to the courts hinges on his ability to access the prison grievance system." Bradley v. Hall, 64 F.3d 1276, 1279 (9th Cir. 1995), overruled on other grounds by Shaw v. Murphy, 532 U.S. 223, 230 n.2 (2001). Because filing administrative grievances and initiating civil litigation are protected activities, it is impermissible for prison officials to retaliate against prisoners for engaging in these activities. Rhodes, 408 F.3d at 567–68. Protected speech also includes an inmate's statement of intent to pursue an administrative grievance or civil litigation. Watison v. Carter, 668 F.3d 1108, 1114 (9th Cir. 2012); Rhodes, 408 F.3d at 567; Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003).

Under the fourth element, plaintiff need not demonstrate a "total chilling of his First Amendment rights," only that defendant's challenged conduct "would chill or silence a person of ordinary firmness from future First Amendment activities." Rhodes, 408 F.3d at 568–69 (citation and internal quotation marks omitted). Moreover, direct and tangible harm will support a retaliation claim even without

1  demonstration of a chilling effect on the further exercise of a prisoner's First

2
   Amendment rights. Id. at 568 n.11. "[A] plaintiff who fails to allege a chilling
3
4  effect may still state a claim if he alleges he suffered some other harm" as a

5  retaliatory adverse action. Brodheim, 584 F.3d at 1269 (citing Rhodes, 408 F.3d at

6
   568 n.11).
7

8      Regarding the fifth element, the Ninth Circuit has held that preserving

9  institutional order, discipline, and security are legitimate penological goals that, if

10
   they provide the motivation for an official act taken, will defeat a claim of
11

12 retaliation. Barnett v. Centoni, 31 F.3d 813, 816 (9th Cir. 1994); Rizzo, 778 F.2d at

13 532. When considering this final factor, courts should "'afford appropriate

14
   deference and flexibility' to prison officials in the evaluation of proffered legitimate
15

16 penological reasons for conduct alleged to be retaliatory." Pratt, 65 F.3d at 807

17 (quoting Sandin v. Conner, 515 U.S. 472, 482 (1995)). Plaintiff bears the burden of

18
   pleading and proving the absence of legitimate correctional goals for defendant's
19

20 challenged conduct. Pratt, 65 F.3d at 806. A plaintiff must prove that the alleged

21 retaliatory motive was the but-for cause of the challenged actions. Hartman v.

22
   Moore, 547 U.S. 250, 260 (2006).
23

24     Here, Plaintiff has failed to provide sufficient admissible evidence that

25 Defendants K. Seibel, R. Solis, and R. Santiago retaliated against him for no valid

26
   penological reason while he was incarcerated at RJ Donovan. Defendant Seibel
27

28 never had any knowledge that others were planning to retaliate, or were retaliating,

                                        22

against Plaintiff at any time. (Seibel Decl. ¶ 10.) Defendants Seibel and R. Solis never took any adverse action against Plaintiff for any protected conduct that he may have engaged in, including placing Plaintiff's name on a list for transfer out of RJ Donovan in September or October 2014; in fact, Plaintiff was recommended to be retained at RJ Donovan, and this recommendation was endorsed on March 26, 2014 and again on September 12, 2014. (Seibel Decl. ¶¶ 3, 8-9; Solis Decl. ¶ 3.) Defendant Santiago never retaliated against Plaintiff for any reason or manufactured any charges against him. (Santiago Decl. ¶¶ 2-3.) And Defendants Seibel, Santiago, and Solis never called Plaintiff a snitch or child molester at any time. (Seibel Decl. ¶ 11; Santiago Decl. ¶ 5; and Solis Decl. ¶ 5.)

The only evidence submitted by Plaintiff that remotely addresses the behavior of Defendants K. Seibel, R. Solis, and R. Santiago is the following: Inmate Lavale Jones declared that Defendant Solis told him that he would get "transferred too" if he did not tell him which officers "Roberts is doing 602's or legal paperwork against." (Jones Decl. ¶ 3, Doc. 119, at 77.) Inmate Kelvin Singleton declared that in July 2014, inmates who were West Coast Crip members said a correctional officer offered "five hundred dollars" to "fuck up an EOP inmate named Roberts … for snitching on him and some other officers who had come on A yard from the hole." (Singleton Decl. ¶ 3-5; Doc. 119, at 110-111.) He stated that he heard from other inmates that Roberts was attacked during night yard. (Id.) Finally, Plaintiff submitted his own declaration stating the following: that Defendant Solis told

23

another inmate that he heard that Roberts was going to be transferred and that, as a result, he was fearful that Defendant Solis was "going to cause me harm again because of filing 602's or legal actions against RJDCF prison officials" (Roberts Decl. ¶¶ 54-55); that Defendant Ciborowski told him that he was going to be transferred and that Chief Deputy Warden Seibel "is tired of you with all these 602's" (Roberts Decl. ¶ 50); and that inmate Billy Titus told him that he overhead Defendant Santiago telling Captain Sanchez that Roberts "had inmate Goldmas, CDCR # F-31549, injure himself in order to set Officer Buenrostro up." (Roberts Decl. ¶ 49.)

Despite this proffer, Plaintiff fails to convince the Court that he has submitted sufficient evidence establishing each of the five elements of a First Amendment retaliation claim as to Defendants Santiago, Seibel, or Solis. To begin, other than providing inadmissible hearsay statements, Plaintiff has not directly addressed the actions of Defendants Santiago or Seibel in his own declaration and has failed to submit any admissible evidence that Defendants Santiago or Seibel retaliated against him. With regard to Defendant Solis, although inmate Lavale Jones declared that Defendant Solis told him that he would get "transferred too" if he did not tell him which officers "Roberts is doing 602's or legal paperwork against" (Jones Decl. ¶ 3, Doc. 119, at 77), the record shows that Plaintiff was recommended to be retained and remained at RJ Donovan in the fall of 2014; moreover, other than offering hearsay statements and conclusory arguments, Plaintiff has failed to

24

specify with particularity the actual "harm" Defendant Solis committed against him specifically to chill his First Amendment rights. Because the Court finds that Plaintiff has failed to present any evidence of sufficient caliber or quantity to support a jury verdict in his favor as to the retaliation claims made against Defendants K. Seibel, R. Santiago, and R. Solis, the Court recommends that Defendants' motion for summary judgment as to the retaliation claims against these three Defendants be granted.

**B. Some of Plaintiff's First Amendment retaliation allegations against Defendants Parker, Meza, Davis, and Buenrostro survive summary judgment.**

In Defendants' motion for summary judgment, Defendants Parker, Meza, Davis, and Buenrostro have submitted evidence that they did not retaliate against Plaintiff in violation of the First Amendment. However, unlike the lack of evidence against the other three Defendants, Plaintiff has presented enough evidence that could support a jury verdict that Defendants Parker, Meza, Davis, and Buenrostro retaliated against Plaintiff for the sole purpose of chilling his First Amendment rights.

**Defendant Parker**

Defendant Parker declared that he did not confiscate a civil rights lawsuit during a search of Plaintiff's cell on June 3, 2014, that he did not "concoct" false disciplinary charges against Plaintiff, that he did not "plant" a bag of tobacco on

25

Plaintiff's bunk, that he did not search Plaintiff's cell in retaliation for any protected

conduct that Plaintiff may have engaged in or for any other improper reason, and

that he did not conspire with Defendant Buenrostro, or any other correctional staff

member or inmate, to file false disciplinary charges against Plaintiff. (Parker Decl.

¶¶ 2, 4, and 6.) In his opposition papers, Plaintiff has provided the following

evidence to support his First Amendment retaliation allegations: Plaintiff submitted

his own declaration stating that Defendant Parker confiscated a motion for

preliminary injunction with attached declarations during a cell search, which denied

him the ability to support his allegations for a preliminary injunction. (Roberts

Decl. ¶¶ 42, 44, Doc. 119, at 37-38.)

**Defendant Meza**

Defendant Meza declared that he did not take any adverse action against

Plaintiff because Plaintiff corresponded with the "class monitors" of CDCR's

mental health delivery system, that he never interfered with or refused to process

Plaintiff's outgoing or incoming mail, that he never confiscated or otherwise

obtained any of Plaintiff's legal materials, that he never manufactured any charges

against Plaintiff at any time, and that he never called Plaintiff a snitch or child

molester. (Meza Decl. ¶¶ 2, 3, 4, 5, and 6.) In his opposition papers, Plaintiff has

provided the following evidence to support his First Amendment retaliation

allegations: He submitted his own declaration stating that Defendant Meza refused

to process as outgoing mail a Coleman letter to class monitors on March 6, 2014 as

26

well as a declaration from inmate Russell Squires, who said that Defendant Meza told him that Roberts was a snitch for writing 602's against fellow correctional officers and that he said that he refused to give him "disinfect, cell phones, lighters, tobacco . . . until one of you guys put Bull in the hospital." (Squires Decl. ¶ 2, Doc. 119, at 95.)

**Defendant Davis**

Defendant Davis declared that he never participated in an "ongoing conspiracy to purposefully punish [Plaintiff] for exercising his right to file inmate grievances" and that he never called Plaintiff a snitch or child molester. (Davis Decl. ¶¶ 2-3.) In his opposition papers, Plaintiff has provided the following evidence to support his First Amendment retaliation allegations: Plaintiff submitted his own declaration stating that Defendant Davis engaged in unlawful and repressive conduct against him as he attempted to access RJ Donovan's inmate appeal procedure to complain about the Defendants' conduct towards him, including paying Black Street Gang members money to attack him, which occurred on July 14, 2014. (Roberts Decl. ¶¶ 22 and 53, Doc. 119, at 33, 40.) He also submitted the declaration of inmate Mark Barbee, who declared that Defendant Davis told him that Roberts is a snitch because he "wrote a letter to the Warden and got a lot of investigations going against me and other officers." (Barbee Decl. ¶ 3, Doc. 119, at 89.)

27

**Defendant Buenrostro**

Defendant Buenrostro submitted a declaration stating that he did not take any adverse action against Plaintiff because Plaintiff corresponded with the "class monitors" of CDCR's mental health delivery system, that he did not interfere with or refuse to process Plaintiff's incoming or outgoing mail, and that he did not confiscate a civil rights lawsuit during a search of Plaintiff's cell on June 3, 2014. (Buenrostro Decl. ¶¶ 2, 3, and 11.) Defendant Buenrostro stated that he did not "concoct" false disciplinary charges against Plaintiff, that he did not manufacture any charges against Plaintiff at any time or asked others to do so, and that he has never taken any adverse action against Plaintiff that was not based upon a legitimate, penological reason. (Buenrostro Decl. ¶¶ 12, 20.) Defendant Buenrostro never told Plaintiff that he would "get some payback," never attempted to set up Plaintiff to be injured by other inmates, has never threatened Plaintiff or bribed or caused another inmate to assault, attack, or hurt Plaintiff, and has never called Plaintiff a snitch or child molester at any time. (Buenrostro Decl. ¶¶ 21-24.) Finally, Defendant Buenrostro stated that he conducted a clothed body search of Plaintiff for a valid penological reason, that he never plotted to transfer Plaintiff to another prison (which in any event did not happen in October 2014), and only searched Plaintiff's cell for valid penological reasons. (Buenrostro Decl. ¶¶ 5, 8, 13, and 15.)

In his opposition papers, Plaintiff has provided the following evidence to support his First Amendment retaliation allegations: Plaintiff stated that Defendant

28

Buenrostro refused to process as outgoing mail a <u>Coleman</u> letter to class monitors on March 6, 2014; that he was retaliated against by Defendant Buenrostro during a pat-down search ("sexual assault"); that Defendant Buenrostro falsely accused him of having contraband during the search of his cell on June 3, 2014; that Defendant Buenrostro told inmate Gerald Marshall that Plaintiff was a "snitch;" and that Defendant Buenrostro told inmate Curtis Rusher that Plaintiff was a "child molester." (Roberts Decl. ¶¶ 27, 31, 45, 56-58, Doc. 119, at 34-35, 38, 41.) Plaintiff also submitted the following inmate declarations: Inmate Juley Gordon stated that Defendant Buenrostro told him that anyone found helping Plaintiff file 602 appeals would be on his hit-list (Gordon Decl. ¶ 7, Doc. 119, at 83); Inmate Gerald Marshall declared that Defendant Buenrostro called Plaintiff Roberts a "snitch," told him the Crips "got off on his ass a couple of months ago on the yard," and told him not to help Plaintiff with his legal papers (Marshall Decl. ¶ 1, Doc. 119, at 98); Inmate Curtis Rusher declared that Defendant Buenrostro told him that Plaintiff was arrested for child molestation in the 1980s and expressed his desire to see Plaintiff "handled good enough to get him out of here!" (Rusher Decl. ¶ 2, Doc. 119, at 100); and Inmate Keith Williams declared that Defendant Buenrostro told him if he and his "homeboys" put Plaintiff "in the hospital this time," he would bring "anything you want in here" (Williams Decl. ¶ 1, Doc. 119, at 103).

///

///

**Analysis**

While Plaintiff has failed to put forth sufficient evidence demonstrating that a retaliatory motive to chill Plaintiff's First Amendment rights was the but-for cause of Defendant Buenrostro's clothed body search of Plaintiff, the searches of his cell for contraband, or Plaintiff's retention status at RJ Donovan, Plaintiff has demonstrated that there is a need for a trial to decide the following: 1) whether Defendant Parker confiscated his legal papers to deny him access to the courts; 2) whether Defendant Buenrostro labeled Plaintiff a snitch or a child molester in front of other inmates in order to chill Plaintiff's First Amendment rights; 3) whether Defendant Davis labeled Plaintiff a snitch to another inmate and engaged in retaliatory conduct including paying others to harm Plaintiff in order to chill Plaintiff's First Amendment rights; 4) whether Defendant Meza called Plaintiff a snitch in front of another inmate and made attempts to deter Plaintiff's First Amendment conduct; 5) whether Defendant Buenrostro recruited other inmates to harm Plaintiff in order to chill Plaintiff's First Amendment rights; and 6) whether Defendant Buenrostro refused to process his litigation mail or otherwise deterred Plaintiff's ability to pursue the legal process in order to chill Plaintiff's First Amendment rights. Viewing the facts in light most favorable to Plaintiff, the Court concludes that by providing evidence that Defendant Parker confiscated his legal papers and that Defendants Buenrostro, Meza, and Davis referred to Plaintiff as a snitch in front of other inmates, put Plaintiff at potential risk of assault from other

prisoners, and made verbal and/or physical attempts to thwart Plaintiff's access to the legal process, Plaintiff has raised triable issues of fact as to whether Defendants Parker's, Meza's, Davis's, and Buenrostro's actions chilled the exercise of his First Amendment rights for no valid penological reason.

Although defense counsel has raised the defense of qualified immunity which protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known," Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," and must, as in other cases, view the evidence in the light most favorable to the nonmovant. Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014). The inquiry of whether a constitutional right was clearly established must be undertaken in light of the "specific context" of the case and not as a broad general proposition. Saucier v. Katz, 533 U.S. 194, 202 (2001) (overruled on other grounds). The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he was in. Id. Whether the alleged adverse acts of harassment and intimidation taken by Defendants Parker, Davis, Meza, and Buenrostro would likely chill a person of ordinary firmness from continuing to exercise his First Amendment rights remains a question of fact, and thus the issue

31

of qualified immunity with respect to Defendants Parker, Davis, Meza, and Buenrostro cannot now be decided as a matter of law.

In sum, Defendants' motion for summary judgment of Plaintiff's First Amendment retaliation claims against Defendants Parker, Davis, Meza, and Buenrostro should be denied.

**C. Plaintiff's state law claims do not survive summary judgment.**

In addition to his federal claims, Plaintiff has asserted state law claims under California Penal Code §§ 2600, 2651, and 2601(b) (Doc. 1, at ¶¶ 82-84) and under Title 15 of the California Code of Regulations, §§ 3004, 3060(a), 3061, 3084.1(d), 3084.2(f), 3130, 3133(e), 3141(c)(1), 3142, 3144, 3268.2 (c)(1), 3271, 3291(c), and 3401.5(a)(3)(E)(F)[3] (Doc. 1, at ¶¶ 84-95). Plaintiff has also asserted a general negligence claim against Defendant Seibel "for failing to institute measures to control subordinates and supervise" the correctional officer Defendants. (Doc. 1, at ¶ 96.) In their reply brief, Defendants make two arguments: 1) Plaintiff failed to produce evidence showing that Defendants are not entitled to summary judgment on Plaintiff's state law claims; and 2) the state law provisions cited by Plaintiff do not contain any civil-enforcement provisions. (Doc. 175, at 3-5.)

---

[3] Plaintiff argues that "Defendant Buenrostro violated California law on April 2, 2014 by committing sexual assault or battery upon Plaintiff's person." (Doc. 1, at 28.) As Cal. Code Regs. tit 15, § 3401.5 is a California prison regulation that addresses sexual misconduct by prison staff, the Court interprets Plaintiff's state law assault and battery claim as an alleged violation of this rule.

32

With regard to Plaintiff's alleged violations of the California Penal Code, Plaintiff fails to state a claim. See Logan v. Lonigro, 2013 WL 4049096, at *3 (E.D. Cal. August 7, 2013). Plaintiff may not sue Defendants for violations of the Penal Code in federal court. Ellis v. City of San Diego, 176 F.3d 1183, 1189 (9th Cir. 1999) (finding the district court properly dismissed claims brought under various sections of the California Penal Code because those code sections did not create enforceable individual rights); see Gonzaga University v. Doe, 536 U.S. 273, 283–86 (2002) (basing a claim on an implied private right of action requires a showing that the statute both contains explicit rights creating terms and manifests an intent to create a private remedy); see also Allen v. Gold Country Casino, 464 F.3d 1044, 1048 (9th Cir. 2006) (no private right of action for violation of criminal statutes).

With regard to Plaintiff's alleged violations of Title 15 of the California Code of Regulations, "[t]he Court is unaware of any authority for the proposition that there exists a private right of action available to Plaintiff for violation of Title 15 regulations." Logan v. Lonigro, 2013 WL 4049096, at *3 (E.D. Cal. August 7, 2013). Under California law, "[i]t is well settled that there is a private right of action to enforce a statute "only if the statutory language or legislative history affirmatively indicates such an intent. . . . Particularly when regulatory statutes provide a comprehensive scheme for enforcement by an administrative agency, the courts ordinarily conclude that the Legislature intended the administrative remedy

33

to be exclusive unless the statutory language or legislative history clearly indicates an intent to create a private right of action." Thurman v. Bayshore Transit Management, Inc., 138 Cal. Rptr. 3d 130, 146 (Cal. Ct. App. 2012) (citations and internal quotations omitted). Under Title 15 of the California Code of Regulations, the State of California provides its prisoners and parolees the right to appeal administratively "any departmental decision, action, condition or policy perceived by those individuals as adversely affecting their welfare." CAL CODE REGS. tit 15, § 3084.1(a). A prisoner may even file appeals alleging violations of prison regulations by correctional officers. See id. § 3084.1(e); see Houseman v. Padilla, 2002 WL 1578860, at *1 (N.D. Cal. July 12, 2002). Because Title 15 provides an administrative remedy to enforce its provisions and the statutory language and legislatively history do not clearly indicate an intent to create a private right of action to enforce Title 15 regulations in a court of law, the Court finds that Plaintiff has failed to state an enforceable claim in federal court under any of the provisions that he has cited under Title 15. Cf. Logan v. Lonigro, 2013 WL 4049096, at *3 (E.D. Cal. Aug. 7, 2013) (no private right of action under California Government Code section 3000); Bailey v. Root, 2010 WL 2803950, at *4 (S.D. Cal. July 14, 2010) (no private right of action for speedy-trial provisions of the California Constitution). Even if there were arguably a private right of action enforceable in a court of law under any of the regulations in Title 15, "[t]he district courts may decline to exercise supplemental jurisdiction over a [state law] claim" if it "raises a

34

novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). On discretionary grounds, the Court recommends not exercising supplemental jurisdiction over these arguably non-enforceable state law claims under Title 15 in federal court.

Finally, with regard to Plaintiff's general negligence claim against Defendant Seibel "for failing to institute measures to control subordinates and supervise" the correctional officer Defendants (Doc. 1, at ¶ 96), Plaintiff has failed to submit any admissible evidence in the form of a declaration or other means supporting his allegation against Defendant Siebel, who has denied any wrongdoing. In her declaration, Seibel specifically states that she never conspired with any correctional staff member, inmate, or any other person to retaliate against Plaintiff or otherwise violate his civil rights and that she had no knowledge that any correctional staff member acted inappropriately toward Plaintiff or was retaliating against Plaintiff. (Seibel Decl. ¶ 4, Doc. 172-8, at 2.) She had no knowledge that any disciplinary charges filed against Plaintiff were false or fabricated, and she had not seen any such evidence. (Id.) Seibel's declaration further illustrates the actions she took relative to Plaintiff and the efforts she made to ensure that all her actions relative to Plaintiff were proper. There is no evidence showing that Seibel breached any duty owed to Plaintiff, and Plaintiff does not submit any admissible evidence rebutting the evidence in Seibel's declaration. As such, summary judgment as to any negligence claim against Seibel is warranted.

## VI. CONCLUSIONS

For the aforementioned reasons, the Court recommends the following:

1) that Defendants' summary judgment motion be granted as to Plaintiff's First Amendment claims against Defendants Solis, Santiago, and Seibel;

2) that Defendants' summary judgment motion be denied as to Plaintiff's First Amendment claims against Defendants Parker, Davis, Meza, and Buenrostro; and

3) that Defendants' summary judgment motion be granted as to all of Plaintiff's state law claims.

The Court submits this Report and Recommendation to United States District Judge William Q. Hayes under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

**IT IS HEREBY ORDERED** that any party to this action may file written objections with the Court and serve a copy on all parties no later than **February 14, 2019**. The document should be captioned "Objections to Report and Recommendation."

The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's Order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

36

**IT IS SO ORDERED**.

DATE: January 25, 2019

HON. RUTH BERMUDEZ-MONTENEGRO
U.S. Magistrate Judge